UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

RANDY J. PITCHER

                    Plaintiff,

                                        **REPORT AND RECOMMENDATION**
                                        **06-CV-1395 (LEK)**

MICHAEL J. ASTRUE[1]
COMMISSIONER OF SOCIAL SECURITY,

                    Defendant.

# Jurisdiction

1.      This case was referred to this Court by Chief Judge Norman A. Mordue, pursuant

to 28 U.S.C. § 636(b) and Northern District of New York Local Rule 72.3.  This case has

proceeded in accordance with General Order 18 of this Court which sets forth the

procedures to be followed when appealing a denial of Social Security benefits.  Both

parties have filed briefs.  For the reasons discussed below, I recommend that the matter

be remanded.

# Background

2.      Plaintiff Randy J. Pitcher challenges the Administrative Law Judge's ("ALJ")

determination that he is not entitled to Disability Insurance Benefits ("DIB") or

Supplemental Security Income ("SSI").  Plaintiff alleges that he was disabled from

January 29, 2004, because of L4-5 disc herniation, facet hypertrophy in the lumbosacral

spine and bilateral L4 neural foraminal stenoisis; cervical strain with disc buling; chronic

---

[1] On February 12, 2007, Michael J. Astrue was sworn in as the Commissioner of the Social Security
Administration.  Pursuant to Federal Rules of Civil Procedure 25(d)(1), he is automatically substituted for
former Commissioner Jo Anne B. Barnhart as the defendant in this action.

obstructive pulmonary disease ("COPD"); emphysematous changes of the apices; migraines; and depression.  In denying Plaintiff's claim, the ALJ found that Plaintiff was able to perform a limited range of light work and a full range of sedentary work (R. at 33).[2]  Therefore, the ALJ determined that Plaintiff was not entitled to DIB or SSI.  Id. Plaintiff met the disability insured status requirements of the Act at all times up through the date of the ALJ's decision.

## Procedural History

3.      Plaintiff protectively filed for DIB and SSI on September 1, 2004 (R. at 68). These claims were denied on November 19, 2004 (R. at 35).  Following a hearing, the ALJ issued a decision on September 22, 2005, in which he found that Plaintiff had not met the requirements for disability (R. at 34).  The Appeals Council denied Plaintiff's request for review on September 18, 2006 (R. at 4-6).

4.      On November 17, 2006, Plaintiff filed a Civil Complaint challenging Defendant's final decision and requesting the Court review the decision of the ALJ pursuant to Section 405(g) and 1383(c)(3) of the Act, modify the decision of Defendant and grant DIB and SSI to Plaintiff for the period beginning January 29, 2004.[3]  Defendant filed an answer to Plaintiff's complaint on March 15, 2007, requesting the Court to dismiss Plaintiff's complaint.  Plaintiff submitted a Memorandum of Law (hereinafter called "Plaintiff's Brief") on April 30, 2007.  On May 7, 2007, Defendant filed a Memorandum of Law in Support of His Motion (hereinafter called "Defendant's Brief") for Judgment on

---

[2] Citations to the underlying Administration are designated as "R."
[3] The ALJ's September 22, 2005, decision became the Commissioner's final decision in this case when the Appeals Council denied Plaintiff's request for review.

the Pleadings[4] pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.  After full

briefing, the Court deemed oral argument unnecessary and took the motions under

advisement.

## Facts

### Medical Examiners

Plaintiff saw Dr. Wilson on February 3, 2003, complaining of a toothache and

lower jaw pain (R. at 119).  Plaintiff was found to have a dental abscess (R. at 118).

Plaintiff was told to take Clindamycin.[5]  Id.  Plaintiff was seen again by Dr. Wilson on

February 18, 2003, diagnosed with bronchitis, and prescribed Amoxicillin[6] (R. at 120).

Plaintiff continued to complain of chest congestion and sinus pain on April 7, 2003 (R. at

121).  The reviewer noted that Plaintiff was smoking a pack of cigarettes per day.  Id.

Plaintiff also complained of depression.  Id.  Plaintiff was given Tequin,[7] Zoloft,[8] and

Xanax.[9]  Id.  It was also noted at that time that Plaintiff had COPD[10] and a history of

pneumothorax.[11]  Id.  Plaintiff continued to complain of chest congestion, a cough, and

sinus pain on April 14, 2003 (R. at 122).  Dr. Wilson prescribed Amoxicillin.  Id.  Plaintiff

was given another prescription for Amoxicillin on May 6, 2003, by Dr. Wilson (R. at 123).

Dr. Wilson diagnosed Plaintiff again with bronchitis again on May 29, 2003 (R. at 128).

---

[4] Although no motion for judgment on the pleadings was filed, the moving party was excused from such filing under General Order No. 18, which states in part: "The Magistrate Judge will treat the proceedings as if both parties had accompanied their briefs with a motion for judgment on the pleadings…"
[5] An antibiotic.  *Dorland's Illustrated Medical Dictionary*, 378 (31st ed. 2007).
[6] An antibiotic.  *Dorland's* at 66.
[7] Trademark for gatifloxacin, an antibiotic.  *Dorland's* at 1906, 777.
[8] Trademark for sertraline hydrochloride, treats depression, as well as panic and obsessive-compulsive disorders.  *Dorland's* at 2120, 1724.
[9] Trademark for alprazolam, treats anxiety and panic disorders.  *Dorland's* at 2113, 55.
[10] "1. [A]ny disorder characterized by persistent or recurring obstruction of bronchial air flow, such as chronic bronchitis, asthma, or pulmonary emphysema. 2. [H]eaves."  *Dorland's* at 538.
[11] "[A]n accumulation of air or gas in the pleural space;" *Dorland's* at 1497.

3

On June 3, 2003, Plaintiff requested a note to be out of work for the week, but was denied[12] (R. at 126).  Plaintiff complained of post nasal drip, a cough, and tooth pain on June 5, 2003[13] (R. at 125).  On June 16, 2003, Dr. Magsino, a co-worker of Dr. Wilson's, restarted Plaintiff on Clindamycin, and also prescribed Vicodin,[14] DC Tessalon,[15] and Dextromethorphan.[16]  Id.

At Dr. Magsino's request, Plaintiff underwent a chest multi view exam on June 6, 2003, at the Oswego Hospital (R. at 148).  Dr. Jackson, the physician conducting the exam, found "[r]ight apical lucency, question bullous disease vs. small apical pneumothorax."  Id.  Also, at the request of Dr. Magsino, Plaintiff underwent a chest CT scan, at the Oswego Hospital, on June 18, 2003 (R. at 146).  Dr. Jackson found "[e]mphysematous changes of the right apex.  No parenchymal nodular lesion identified. Borderline mediastinal adenopathy."  Id.

The results of Plaintiff's CT scan of his chest were reviewed by Dr. Wilson on June 23, 2003 (R. at 129).  Dr. Wilson noted "emphysematous changes at the right apex with no nodules.  There is some borderline mediastinal adenopathy, but I don't think this would be significant in this setting."  Id.  Ultimately, Dr. Wilson found that "[i]t could well be that we are dealing with a chronic cough which is due to GERD."[17]  Id.  Dr.

---

[12] It is unclear from the record with whom Plaintiff met (R. at 126).

[13] It is unclear from the record with whom Plaintiff met (R. at 125).

[14] Trademark for a combination of hydrocodone bitartrate, an analgesic and antitussive, and acetaminophen.  *Dorland's* at 2084, 890.

[15] Trademark for benzonatate, an antitussive.  *Dorland's* at 1907, 212.

[16] An antitussive.  *Dorland's* at 512.

[17] Gastroesophageal Reflux Disease.  Gerd.com, *Glossary*, http://www.gerd.com/consumer/glossary.aspx.

Wilson prescribed Prevacid,[18] Astelin nasal spray, and Darvocet.[19] Id. Dr. Wilson also suggested Plaintiff try the nicotine patch to help him stop smoking. Id.

Plaintiff was back with Dr. Wilson on July 11, 2003 for a sore throat and a cough (R. at 130). Plaintiff was given an antibiotic. Id. Plaintiff saw Dr. Wilson on October 17, 2003, complaining of a cough as well as pain in his neck and left shoulder (R. at 131). Dr. Wilson suggested another chest x-ray. Id. Dr. Wilson also noted that Plaintiff was smoking two packs a day, and stressed the need to quit as he was previously diagnosed with emphysema and pneumothorax. Id.

Dr. Wilson requested Plaintiff undergo another chest multi view exam on October 22, 2003, at the Oswego Hospital (R. at 145). Dr. Guthikonda, the physician conducting the exam, found a "[s]uggestion of chronic obstructive lung disease with bullous disease in . . ." the ". . . apical regions bilaterally, more pronounced in right size." Id. Dr. Guthikonda did not discover any significant changes from the exam on June 6, 2003. Id.

Plaintiff was given a prescription for Tylenol #3 for back pain, on December 12, 2003 (R. at 132).[20] Dr. Magsino saw Plaintiff on January 22, 2004, for a toothache (R. at 133). Plaintiff was given Clindamycin. Id.

Plaintiff saw Dr. Wilson on February 11, 2004 (R. at 134). Plaintiff stated on January 29, 2004, he had been "rear ended" in a car accident resulting in low back pain

[18] Trademark for lansoprazole, for treatment of ulcers, gastroesophageal reflux disease, and hyperchlorhydria. *Dorland's* at 1536, 1019.
[19] Trademark for a combination of propoxyphene napsylate, an analgesic, and acetaminophen. *Dorland's* at 479, 1551.
[20] Plaintiff met with someone at Owego County Opportunities, where both Dr. Wilson and Dr. Magsino work, but the signature was not legible (R. at 132).

radiating to his right leg.  Id.  Dr. Wilson found Plaintiff was positive for Lasegue's[21] sign

and his "reflexes [were] 3+ and 1+ in both knees and ankles and fairly equal."  Id.

Plaintiff was given Skelaxin,[22] Vicodin, and instructed to start physical therapy.[23]  Id.  On

February 19, 2004, Dr. Wilson noted that Plaintiff's "straight leg raise is still markedly

positive.  Reflexes are 2+ at the knees and ankles with no diminishment there" (R. at

135).  Plaintiff's Vicodin was increased, an MRI was ordered, Plaintiff was instructed to

see a surgeon for a back evaluation, and physical therapy was suggested.  Id.

        Plaintiff underwent an MRI of the lumbar spine on March 5, 2004, at Dr. Wilson's

request, at the Oswego Hospital (R. at 144).  Dr. Suchnicki, the physician who

completed the exam, found a "[r]ight paracentral disc protrusion at L4/5."  Id.

        Dr. Wilson reviewed the results of Plaintiff's MRI on March 15, 2004 (R. at 136).

Dr. Wilson found "a right paracentral disc protrusion at L4-5."  Id.  Dr. Wilson also noted

that Plaintiff's "reflexes . . . are still normal.  His slump test is positive."  Id.  Plaintiff was

referred to physical therapy and for a spinal surgery evaluation with Dr. Blecha.[24]  Id.

Plaintiff continued to complain of neck and back pain.  Id.  Dr. Wilson noted, on March

30, 2004, the Plaintiff had quit smoking three weeks prior (R. at 139).

        On May 5, 2004, Dr. Wilson reviewed Plaintiff's April 13, 2004, visit with pain

specialist, Dr. Kuthuru (R. at 140, 141).  Dr. Kuthuru requested a second MRI that would

---

[21] Lasegue's sign (lah-seg´)  in sciatica, aggravation of pain in the lower limb and back elicited by passive raising of the heel from the bed with the knee straight; no pain is produced when the knee is flexed.  See http://www.mercksource.com/pp/us/cns/cns_hl_dorlands_split.jsp?pg=/ppdocs/us/common/dorlands/dorland/five/000057605.htm

[22] Trademark for metaxalone, a "skeletal muscle relaxant . . . ."  Dorland's at 1748, 1163.

[23] There are several references to starting physical therapy throughout Plaintiff's medical history (R. at 134, 135, 136, 258).  However, the record does not indicate whether Plaintiff did indeed meet with a physical therapist.

[24] There are several references to seeing a surgical consultant throughout Plaintiff's medical history.  (R. at 136, 204, 222).  However, the record does not indicate whether Plaintiff ever met with anyone.

include Plaintiff's neck as well as his beck (R. at 104).  Dr. Kuthuru also "felt that there

may be a need for L1-S1 facette nerve blocks and possibly C2-C6 facette nerve blocks

in the cervical spine."  Id.  Plaintiff stated Percocet[25] had helped his pain considerably.

Id.

  Plaintiff met with Dr. Kuthuru on May 11, 2004 (R. at 200).  Dr. Kuthuru

diagnosed: "1. Spondylosis[26] without myelopathy – lumbosacral spine.  2.

Radiculitis/radiculopathy.[27]  3. Myofascial pain" (R. at 201).  Plaintiff opted to start L1-S1

nerve blocks, and to continue with medications, to help control his pain.  Id.  Plaintiff

saw Dr. Kuthuru again on June 1, 2004, at which time he recommended Plaintiff

undergo electromyography testing (R. at 203-204).

  Plaintiff met with Dr. Magsino on June 4, 2004 (R. at 141).  Plaintiff stated his

back pain was a six out of ten and would radiate to his right leg occasionally.  Id.

Plaintiff also complained that the pain in his lower back was "aggravated simply by

walking, twisting, bending, or even staying in one place."  Id.  However, Dr. Magsino

noted that Plaintiff "look[ed] comfortable, not in distress . . . . [and e]xamination of the

neck did not reveal any significant pain."  Id.  Dr. Magsino diagnosed back pain with

sciatica and cervicalgia and renewed his Percocet.  Id.

  Plaintiff met with Dr. Kuthuru on June 22, 2004, to discuss the results of his

electromyography study (R. at 205).  Dr. Kuthuru found that the test was abnormal.  Id.

It showed "bilateral L5/S1 chronic radiculopathy.  This is present to a greater extent on

the right S1 neuotomal segment.  There is evidence of prior axonal loss with

---

[25] Trademark for a combination of oxycodone hydrochloride and acetaminophen.  *Dorland's* at 1429.
[26] "1. [A]nkylosis of a vertebral joint.  2. [D]egenerative spinal changes due to osteoarthritis."  *Dorland's* at 1780.
[27] "[D]isease of the nerve roots."  *Dorland's* at 1595.

electrodiagnostic evidence of reinnervation."  Id.  Dr. Kuthuru recommended that

Plaintiff receive interventional pain management and have a spine surgical consultation.

Id.  Plaintiff saw Dr. Kuthuru again on July 6, 2004 (R. at 204).  Plaintiff stated he was

feeling relief from the injections, but noted some soreness at the injection sites (R. at

206).

On July 27, 2004, Plaintiff was back with Dr. Kuthuru (R. at 209).  Plaintiff stated

that he had decreased pain in his lower back, but that his neck was starting to hurt

again.  Id.  Plaintiff also complained of pain and numbness that would radiate down to

his lower extremities.  Id.

Plaintiff saw Dr. Wilson again on August 3, 2004 (R. at 142).  Plaintiff stated he

had been receiving pain injections with Dr. Kuthuru, but that the injections themselves

were quite painful.  Id.  Plaintiff also stated he was becoming depressed due to his pain

and being let go from his job.  Id.  Plaintiff was given a prescription for Zoloft.  Id.

Plaintiff requested that his Percocet be reduced on September 27, 2004, to see if a

lower dosage would still be effective (R. at 143).  This was done and Plaintiff was given

"Tylenol #3 for lesser degrees of pain."  Id.  Plaintiff also noted some improvement on

the Zoloft.  Id.

Plaintiff saw Dr. Kuthuru again on August 24, 2004 (R. at 211).  Plaintiff stated

his pain had returned on his right side, but his left side was doing well after the

injections.  Id.  Plaintiff also opted to undergo radiofrequency ablation.  Id.

Plaintiff went to the Oswego Hospital on September 17, 2004, complaining of

back pain on his left side radiating to his left flank, groin, and testicular area (R. at 197).

8

Plaintiff was discharged later that day with the instructions to take fluids, rest, and to take his Percocet for the pain (R. at 157).

On October 12, 2004, Plaintiff was back with Dr. Kuthuru (R. at 214).  Plaintiff noted decreased pain in his lower back, but increased pain in his neck and thoracic region that radiated around the side of his chest.  Id.  Plaintiff also stated his pain was aggravated by "walking, bending, twisting, lifting, and pulling activities."  Id.

Plaintiff underwent an MRI of his cervical and thoracic spin on October 15, 2004 (R. at 245).  The MRI of Plaintiff's cervical spine showed "[m]inimal disc bulging at the level of C4/5.  Minimal facet joint spur at the level of C4/5.  No evidence of disc herniation."  Id.  The MRI of Plaintiff's thoracic was unremarkable.  Id.

Plaintiff was back with Dr. Kuthuru on October 29, 2004, at which time, the results of Plaintiff's most recent MRI were discussed (R. at 216).  Dr. Kuthuru noted "disc pathology at C5-C6.  There is also evidence of disc degeneration with loss of signal on 3-2 weighted images.  There are also findings of facet[28] pathology in the cervical spine."  Id.  Plaintiff also complained of pain and paresthesias radiating into his upper extremities.  Id.

Plaintiff was back with Dr. Kuthuru on December 7, 2004, with the same complaints of pain, but stated the medications offered some relief (R. at 219).  On January 18, 2005, Plaintiff complained of neck pain that caused headaches (R. at 222).  He stated that his current pain medications offered some relief of his back pain, but little for his neck pain, and none for his headaches.  Id.  Plaintiff agreed to see a spinal

---

[28] "[A] small surface on a hard body, as on a bone; . . . ."  *Dorland's* at 676.

surgeon for any recommendations.  Id.  On February 23, 2005, Plaintiff continued to complain of neck and back pain (R. at 225).

Plaintiff saw Dr. Wilson again on January 12, 2005 (R. at 256).  Plaintiff complained that the Percocet was no longer helping his back pain, and the medication was raised to a higher dosage.  Id.  Dr. Wilson also noted that Plaintiff had several social problems, and increased his Zoloft.  Id.  Plaintiff was back with Dr. Wilson on February 9, 2005, complaining of back pain, neck pain, a cough, and chest congestion (R. at 258).  Dr. Wilson recommended Plaintiff go to physical therapy for his neck and back pain.  Id.  Dr. Wilson also noted that Plaintiff's "posture [was] actually quite conducive to the production of neck pain and low back pain  . . . ."  Id.  Plaintiff was also given Doxycycline,[29] for his cough and congestion.  Id.

Plaintiff was back again with Dr. Wilson on March 15, 2005 (R. at 259).  Plaintiff stated he was feeling better with the higher dosage of Zoloft, but the medicine was not helping him as much as it had previously.  Id.  Dr. Wilson suggested Plaintiff increase the dose yet again.  Id.  Plaintiff also continued to complain of his back pain and sciatica.  Id.

Plaintiff was seen again by Dr. Kuthuru on March 23, 2005 (R. at 228).  Plaintiff complained of pain radiating down his right lower extremity, and weakness in his lower extremities.  Id.  Plaintiff also complained of paresthesias in his extremities (R. at 229).  Dr. Kuthuru found that Plaintiff was positive for a straight leg test on the right.  Id.  On March 25, 2005, Plaintiff stated he was doing better (R. at 231).  Plaintiff was instructed to do a home exercise program.  Id.

---

[29] An antibiotic.  *Dorland's at 572.*

On April 5, 2005, Plaintiff underwent right L3-S1 medial branch blocks with Dr. Kuthuru (R. at 234). Dr. Kuthuru noted no complications and the procedures were well tolerated by Plaintiff (R. at 235). Despite the procedure, Plaintiff continued to complain of pain in his neck and lower back, radiating to his right lower extremity, on April 22, 2005 (R. at 236). Plaintiff also stated he was currently taking Ultracet.[30] Id.

On May 9, 2005, Plaintiff underwent right L4-S2 medial branch blocks with Dr. Kuthuru (T. at 239). At that time, Dr. Kuthuru noted that the previous procedures resulted in a 40-50% relief, but Plaintiff continued to experience pain on his right side. Id. Dr. Kuthuru also noted that the procedures were well tolerated by Plaintiff, and there were no complications. Id.

Plaintiff met with Dr. Kuthuru, on May 31, 2005 (R. at 241). Plaintiff stated he was experiencing more pain on his left paralumbar region, and his left facet nerve block was scheduled. Id. Dr. Kuthuru recommended Plaintiff do a home exercise program. Id.

Dr. Wilson saw Plaintiff again on June 10, 2005 (R. at 260). Plaintiff stated his migraines had returned and was prescribed Midrin.[31] Id. Dr. Wilson noted that Plaintiff was no longer taking either Percocet or Vicodin, and relying completely on Ultracet. Id. Dr. Wilson also gave Plaintiff a prescription for nicotine patches as Plaintiff was now smoking two to three packs of cigarettes per day. Id.

On July 1, 2005, Dr. Wilson filled out a physical and mental medical source statement ("MSS") (R. at 247). Dr. Wilson diagnosed Plaintiff with the following: "(1)

---

[30] Trademark for a combination of tramadol hydrochloride, an analgesic, and acetaminophen. *Dorland's* at 2027, 1977.
[31] Dr. Wilson stated he prescribed Plaintiff Midrib (R. at 260). However, it is assumed he prescribed Midrin, as Midrin is used to treat migraines. *Dorland's* at 1183, 979, 520.

cervical strain with chronic neck pain (2) emphysema with h[istory of] pneumothorax (3) depression (4) back pain [secondary to right] paracentral disc protrusion (5) migraine." Id. Dr. Wilson opined that Plaintiff had a fair prognosis for his back pain, but a poor prognosis for his lungs. Id. Dr. Wilson stated that Plaintiff's impairments have either lasted or could be expected to last at least twelve months (R. at 248). Dr. Wilson also found that Plaintiff impairments were reasonably consistent with the symptoms and the functional limitations he described in the evaluation. Id. Dr. Wilson opined that Plaintiff's pain or other symptoms would often interfere with his attention and concentration and he was moderately limited in his ability to deal with work stress. Id. Dr. Wilson stated that Plaintiff could walk one city block without rest, continuously sit and stand for twenty minutes, sit for a total of two hours in a normal workday, and stand/walk for a total of four hours in a normal workday (R. at 248-249). Dr. Wilson opined that, when sitting, Plaintiff would need to walk every twenty minutes for at least three minutes (R. at 249). He also stated that Plaintiff would need to take unscheduled breaks every hour. Id. Dr. Wilson opined that Plaintiff could occasionally lift ten pounds and never lift twenty pounds (R. at 250). Dr. Wilson found that Plaintiff could bend and twist five percent of his work day, and his impairments would likely produce good and bad days. Id. Dr. Wilson stated that Plaintiff also had other limitations, including visual problems, migraine headaches, and breathing problems exacerbated by dust, humidity, and heat. Id.

Dr. Wilson also made findings as to Plaintiff's mental abilities (R. at 251). Dr. Wilson opined that Plaintiff had a good ability to understand and remember very short and simple instructions, carry out very short and simple instructions, and make simple

12

work-related decisions.  Id.  Dr. Wilson found that Plaintiff had a fair ability to remember

work-like procedures, sustain an ordinary routine without special supervision, work in

coordination with or proximity to others without being unduly distracted, complete a

normal workday and workweek without interruptions from psychologically based

symptoms, ask simple questions or request assistance, accept instructions and respond

appropriately to criticism from supervisors, get along with co-workers or peers without

unduly distracting them or exhibiting behavioral extremes, and deal with normal work

stress.  Id.  Dr. Wilson also opined that Plaintiff had a poor or no ability to maintain

attention for a two hour segment, perform at a consistent pace without an unreasonable

number and length of rest periods, and respond appropriately to changes in a routine

work setting.  Id.

      Dr. Wilson opined that Plaintiff's impairments or treatments would cause him to

be absent three or more times a month (R. at 252).  Finally, Dr. Wilson found that

Plaintiff's condition, as stated in the evaluation, existed at least since January 29, 2004.

Id.

### Independent Medical Examiners

      Plaintiff underwent a consultative internal medicine examination with independent

medical examiner ("IME"), Dr. Roy Forrest, on November 8, 2004, at the request of the

Social Security Administration ("SSA") (R. at 171).  Dr. Forrest noted that Plaintiff's

spine had "rotation to right 45 [degrees], to left sixty to seventy [degrees]," (R. at 173).

Dr. Forrest also found that Plaintiff was positive for a straight leg raise on the right and

his strength was a five out of five in both his lower and upper extremities.  Id.  Dr.

Forrest diagnosed: "1. Lower back pain.  2. Neck pain.  3. Depression.  4. Emphysema"

(R. at 174).  Dr. Forrest opined that Plaintiff had a fair prognosis.  Id.  In his MSS, Dr.

Forrest stated that Plaintiff,

> is moderately limited to sitting, standing, prolonged walking, as a result of
> lower back pain.  He is moderately limited to bending and lifting and
> carrying heavy weights, also as a result of back pain.  No limitations on
> use of upper extremities.  He needs to avoid exposure to dust, smoke or
> other respiratory irritants due to a history of emphysema.  Id.

That same day, Plaintiff also underwent a psychiatric examination with IME,

Dennis Noia, Ph.D. (R. at 175).  Dr. Noia diagnosed Plaintiff with Axis I, depressive

disorder, not otherwise specified (R. at 178).  In his MSS, Dr. Noia found that:

> [v]ocationally, the claimant appears to be capable of understanding and
> following simple instructions and directions.  He appears to be capable of
> performing simple and some complex tasks with supervision and
> independently.  He appears to be capable of maintaining attention and
> concentration for tasks.  He can regularly attend to a routine and maintain
> a schedule.  He appears to be capable of learning new tasks.  He appears
> to be capable of making appropriate decisions.  He appears to be able to
> relate to and interact appropriately with others.  He appears to be having
> some difficulty dealing with stress.

Id.  Dr. Noia recommended that Plaintiff continue his medications as they were currently

provided.  Id.  He also opined that Plaintiff had a good prognosis.  Id.

### RFC Analysis

Disability analyst, L. Fedish, completed a non-severe impairment checklist at the

request of the SSA, on November 19, 2004 (R. at 179).  In it, he found that Plaintiff did

not have more than a slight abnormality of mental functions for restrictions in daily

activities, difficulties in maintaining social interaction, difficulties in maintaining

concentration, persistence and pace, and had no repeated episodes of deterioration of

extended duration.  Id.

Disability analyst, L. Fedish, also completed a physical residual functional capacity assessment ("RFC") at the request of the SSA[32] (R. at 199). In it, he found that Plaintiff could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand or/walk about six hours in an eight hour workday, sit about six hours in an eight hour workday, and had an unlimited ability to push and/or pull, other than as shown for lift and/or carry (R. at 195). Fedish also found that Plaintiff had no postural, manipulative, visual or communicative limitations (R. at 196-197). Finally, Fedish found that Plaintiff had no environmental limitations, with the exception that Plaintiff should avoid concentrated exposures of fumes, odors, dusts, gases, poor ventilations, etc., due to his history of COPD (R. at 197).

On December 14, 2004, Thomas Harding, Ph.D., completed a psychiatric review technique at the request of the SSA (R. at 180). In it, he diagnosed Plaintiff with depression, not otherwise specified (R. at 183). He also found that Plaintiff had a mild restriction of daily living activities, mild difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence or pace. Id. He further concluded that there was insufficient evidence to determine whether Plaintiff had repeated episodes of deterioration, each of extended duration. Id.

## Discussion

**Legal Standard of Review:**

A court reviewing a denial of disability benefits may not determine *de novo* whether an individual is disabled. See 42 U.S.C. §§ 405(g), 1383(c)(3); Wagner v. Sec'y of Health & Human Servs., 906 F.2d 856, 860 (2d Cir. 1990). Rather, the

---

[32] There was no date on the report.

Commissioner's determination will only be reversed if it is not supported by substantial evidence or there has been a legal error. <u>See</u> <u>Grey v. Heckler</u>, 721 F.2d 41, 46 (2d Cir. 1983); <u>Marcus v. Califano</u>, 615 F.2d 23, 27 (2d Cir. 1979).  "Substantial evidence" is evidence that amounts to "more than a mere scintilla," and it has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  <u>Richardson v. Perales</u>, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971).  Where evidence is deemed susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld.  <u>See</u> <u>Rutherford v. Schweiker</u>, 685 F.2d 60, 62 (2d Cir. 1982).

"To determine on appeal whether the ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight."  <u>Williams ex rel. Williams v. Bowen</u>, 859 F.2d 255, 258 (2d Cir. 1988).  If supported by substantial evidence, the Commissioner's finding must be sustained "even where substantial evidence may support the plaintiff's position and despite that the court's independent analysis of the evidence may differ from the [Commissioner's]."  <u>Rosado v. Sullivan</u>, 805 F. Supp. 147, 153 (S.D.N.Y. 1992).  In other words, this Court must afford the Commissioner's determination considerable deference, and may not substitute "its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a *de novo* review."  <u>Valente v. Sec'y of Health & Human Servs.</u>, 733 F.2d 1037, 1041 (2d Cir. 1984).

The Commissioner has established a five-step sequential evaluation process to determine whether an individual is disabled as defined under the Social Security Act.

<u>See</u> 20 C.F.R. §§ 404.1520, 416.920.  The United States Supreme Court recognized

the validity of this analysis in <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140-142, 107 S. Ct.

2287, 2291, 96 L. Ed. 2d 119 (1987), and it remains the proper approach for analyzing

whether a claimant is disabled.

> This five-step process is detailed below:

>> First, the [Commissioner] considers whether the claimant is
>> currently engaged in substantial gainful activity.  If he is not, the
>> [Commissioner] next considers whether the claimant has a "severe
>> impairment" which significantly limits his physical or mental ability to do
>> basic work activities.  If the claimant has such an impairment, the third
>> inquiry is whether, based solely on medical evidence, the claimant has an
>> impairment which is listed in Appendix 1 of the regulations.  If the claimant
>> has such an impairment, the [Commissioner] will consider him disabled
>> with-out considering vocational factors such as age, education, and work
>> experience; the [Commissioner] presumes that a claimant who is afflicted
>> with a "listed" impairment is unable to perform substantial gainful activity.
>> Assuming the claimant does not have a listed impairment, the fourth
>> inquiry is whether, despite the claimant's severe impairment, he has the
>> residual functional capacity to perform his past work.  Finally, if the
>> claimant is unable to perform his past work, the [Commissioner] then
>> determines whether there is other work which the claimant could perform.

<u>Berry v. Schweiker</u>, 675 F.2d 464, 467 (2d Cir. 1982) (per curiam); <u>see</u> <u>also</u> <u>Rosa v.</u>

<u>Callahan</u>, 168 F.3d 72, 77 (2d Cir. 1999); 20 C.F.R. § 404.1520.

While the claimant has the burden of proof as to the first four steps, the

Commissioner has the burden of proof on the fifth and final step.  <u>See</u> <u>Bowen</u>, 482 U.S.

at 146 n.5; <u>Ferraris v. Heckler</u>, 728 F.2d 582 (2d Cir. 1984).  The final step of this

inquiry is, in turn, divided into two parts.  First, the Commissioner must assess the

claimant's job qualifications by considering his physical ability, age, education, and work

experience.  Second, the Commissioner must determine whether jobs exist in the

national economy that a person having the claimant's qualifications could perform.  <u>See</u>

42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1520(f); <u>Heckler v. Campbell</u>, 461 U.S. 458,

460, 103 S. Ct. 1952, 1954, 76 L. Ed. 2d 66 (1983).

11.    In this case, the ALJ made the following findings with regard to factual

information as well as the five-step process set forth above:

1. The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits . . . and is insured for benefits through the date of this decision.
2. The claimant has not engaged in substantial gainful activity since the alleged onset of disability.
3. The claimant's emphysema, back impairment with pain, migraine headaches and depression are considered "severe" . . . .
4. These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, regulation No. 4.
5. The undersigned finds the claimant's allegations regarding his limitations are not totally credible . . . .
6. The claimant has the residual functional capacity to lift, carry, push and pull 20 pounds occasionally and 10 pounds frequently, stand and walk 20 minutes at a time for a total of two hours in an eight-hour work day and sit 45 minutes at a time for a total of six hours in an eight-hour work day.  He can also understand, remember and carry out simple instructions; maintain concentration and attention for extended periods; and respond appropriately to supervision, coworkers and work situations.
7. The claimant is unable to perform any of his past relevant work . . . .
8. The claimant is a "younger individual between the ages of 18 and 44" . . . .
9. The claimant has a "high school (or high school equivalent) education" . . . .
10. The claimant has unskilled past work experience . . . .
11. Considering the claimant's residual functional capacity and Social Security Ruling 83-10, the claimant is able to do only a limited range of light work; however, he is capable of doing the full range of sedentary work.
12. Using medical-vocational rules 202.20 and 201.27 as a framework, together with Social Security Ruling 83-10 for guidance, jobs the claimant can perform exist in significant numbers in the national economy.

(R. at 33-34).  Ultimately, the ALJ found that Plaintiff was not under a disability at any time through the date of his decision (R. at 34).

### Plaintiff's Allegations

Plaintiff challenges the decision of the ALJ on the basis that it was based on legal error and not supported by substantial evidence.  Specifically, Plaintiff argues that (1) the ALJ erred by finding that Plaintiff's impairments did not meet Listing 1.04A; (2) the ALJ erred in not appropriately following the treating physician rule; (3) the ALJ's RFC was not supported by substantial evidence; and (4) the ALJ erred at step five of the sequential evaluation.

### Allegation 1: The ALJ Erred in a) Not Explaining Why Plaintiff Failed to Meet Listing 1.04A and b) Finding Plaintiff Failed to Meet Listing 1.04A

12.    Plaintiff's first argument is that the ALJ erred in a) not specifying why he found Plaintiff did not meet a listing; and b) not finding Plaintiff met Listing 1.04A, at step three. See Plaintiff's Brief, pp. 14-16.  Defendant responds by arguing that Plaintiff did not meet all the requirements for Listing 1.04A and the ALJ's reasoning was adequately set forth in his decision.  See Defendant's Brief, pp. 9-12.

"Where the claimant's symptoms as described by the medical evidence appear to match those described in the Listings, the ALJ must provide an explanation as to why the claimant failed to meet or equal the Listings."  Brown ex rel. S.W. v. Astrue, No. 1:05-CV-0985, 2008 WL 3200246, at *10 (N.D.N.Y. Aug. 5, 2008) (quoting Giles v. Chater, No. 95-CV-0010E, 1996 WL 116188, at *5 (W.D.N.Y. Jan. 8, 1996)).

19

The ALJ never stated what Listings, if any, he considered at step three.  Instead, he made the fairly common finding that Plaintiff's severe impairments were "not 'severe' enough to meet or medically equal, either singly or in combination to one of the impairments listed in Appendix I, Subpart P, Regulations No. 4" (R. at 27).

Listing 1.04A, of Appendix 1, Subpart P, Regulations No. 4, states:

Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:

A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); . . . .

20 C.F.R. Pt. 404, Subpt. P, App. 1.  Each of these requirements will be discussed in turn.

The first requirement to meet Listing 1.04A is "[e]vidence of nerve root compression characterized by neuro-anatomic distribution of pain, . . . ."  20 C.F.R. Pt. 404, Subpt. P, App. 1.  The ALJ noted in his decision that "[n]erve conduction studies and EMG in June 2004 were abnormal and most consistent with bilateral L5-S1 chronic radiculopathy,[33] present to a greater extent on the right S1 neurotomal segment" (R. at 27).  Also in the record, Dr. Kuthuru repeatedly diagnosed Plaintiff with radiculopathy. See (R. at 201, 215, 226, 237, 242).  The ALJ also noted that since the car accident, Plaintiff complained of low back pain that radiated into his lower back and "[s]ince that time, the claimant has continued to complain of persistent back and leg pain, as well as

---

[33] "[D]isease of the nerve roots."  *Dorland's* at 1595.

neck pain" (R. at 27).  In addition, the record is also replete with Plaintiff's statements of back pain that occasionally radiated down to his leg.  <u>See</u> (R. at 134, 141, 209, 228, 236, 241).

The second requirement to meet Listing 1.04A is "limitation of motion of the spine . . . ."  20 C.F.R. Pt. 404, Subpt. P, App. 1.  Again, the ALJ stated examinations had shown "some limitation in cervical and lumbar range of motion," (R. at 27).  In addition, the consultative examiner, Dr. Forrest, found that Plaintiff had "rotation to right 45 [degrees], to left 60 to 70 [degrees]," (R. at 173).

The next requirement to meet Listing 1.04A is "motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss . . . ."  20 C.F.R. Pt. 404, Subpt. P, App. 1.  The ALJ noted that examinations have shown "[s]ome distal muscle atrophy mainly in the L4-S1 myotomes, mild strength, proprioceptive and sensory deficits in the lower extremities and painful facets on torsional loading in the lumbosacral spine . . . ." (R. at 27).  In addition, Dr. Kuthuru regularly noted "[s]trength and sensory deficits in the upper and lower extremities []." <u>See</u> (R. at 207, 217, 223, 229, 237, 242).  Plaintiff also complained of numbness in his lower extremities (R. at 209).

The final requirement to meet Listing 1.04A is a "positive straight-leg raising test (sitting and supine); . . . ."  20 C.F.R. Pt. 404, Subpt. P, App. 1.  The ALJ noted that Plaintiff's examinations showed "positive straight leg raising on the right" (R. at 27).  This statement is confirmed by the consultative examiner, Dr. Forrest, who found that the straight leg raising test was "positive on right to 45 [degrees] and confirmed upon

sitting" (R. at 173).  In addition, on February 19, 2004, Dr. Wilson found that Plaintiff

was positive for a straight leg raise test (R. at 135).

Thus, the ALJ recited medical evidence that supports every element in Listing

1.04A; but failed to explain why the evidence he stated supported the finding that

Plaintiff did not meet any Listing.  Thus, evidence in the record, not recited by the ALJ,

supports the finding that Plaintiff met the Listing.  Therefore, to not explain why Plaintiff

failed to meet any Listing was error.  See Brown, 2008 WL 3200246, at *11 (remanding

because the ALJ failed to state what Listing he considered and "did not provide any

discussion or analysis explaining his determination").

Thus, without an analysis by the ALJ, and because there is some conflicting

evidence in the record,[34]  the Court cannot determine whether Plaintiff met or did not

meet Listing 1.04A.  Accordingly, it is recommended that this case be remanded in

order to allow the ALJ an opportunity to explain why Plaintiff did not meet Listing 1.04A.

### Allegation 2: The ALJ Did Not Follow the Treating Physician Rule

#### a) Failure to Afford Dr. Wilson Controlling Weight Without Re-Contacting Him

13.    Plaintiff's second argument is that the ALJ erred in failing to grant Dr. Wilson

controlling weight without re-contacting him to clarify his opinions.  See Plaintiff's Brief,

pp. 17-20.  Defendant responds by arguing that the ALJ gave Dr. Wilson the appropriate

weight in light of the objective medical evidence and there were no gaps in the record

necessitating re-contact.  See Defendant's Brief, pp. 15-18.

---

[34] For example, Dr. Wilson noted that Plaintiff's reflexes were normal on March 15, 2004 (R. at 136). Also,
the consultative examiner, Dr. Forrest, found that Plaintiff's strength was a five out of five in both his
upper and lower extremities (R. at 173).

According to the "treating physician's rule,"[35] the ALJ must give controlling weight to the treating physician's opinion when that opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record."  20 C.F.R. § 404.1527(d)(2); see also Green-Younger v. Barnhart, 335 F.3d 99, 105 (2d Cir. 2003); Shaw v. Chater, 221 F.3d 126, 134 (2d Cir. 2000).  Thus, "[f]ailure to provide 'good reasons' for not crediting the opinion of a claimant's treating physician is ground for remand."  Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999) (citing Schaal v. Apfel, 134 F.3d 496, 505 (2d Cir. 1998)).

Even if a treating physician's opinion is deemed not to be deserving of controlling weight, an ALJ may nonetheless give it "extra weight" under certain circumstances. Under 20 C.F.R. § 404.1527(d)(1)-(6), the ALJ should consider the following factors when determining the proper weight to afford the treating physician's opinion if it is not entitled to controlling weight: (1) length of the treatment relationship and the frequency of examination, (2) nature and extent of the treatment relationship, (3) supportability of opinion, (4) consistency, (5) specialization of the treating physician, and (6) other factors that are brought to the attention of the court.  See de Roman, 2003 WL 21511160, at *9 (citing C.F.R. § 404.1527(d)(2)); see also Shaw, 221 F.3d at 134; Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998).

Plaintiff argues that the ALJ erred in affording Dr. Wilson's treatment notes and MSS moderate weight.  The ALJ granted Dr. Wilson's treatment notes, for the period after Plaintiff's alleged onset date, "moderate weight because while they are treating

---

[35] "The 'treating physician's rule' is a series of regulations set forth by the Commissioner in 20 C.F.R. § 404.1527 detailing the weight to be accorded a treating physician's opinion." de Roman v. Barnhart, No.03-Civ.0075(RCC)(AJP), 2003 WL 21511160, at *9 (S.D.N.Y. July 2, 2003).

physician notes, they consist mostly of conclusions with few diagnostic tests or clinical signs and findings" (R. at 30).

According to Dr. Wilson's treatment notes, the only mention of a diagnostic test, after Plaintiff's alleged onset date, occurred on March 15, 2004, for an MRI performed on March 5, 2004[36] (R. at 136, 144).  Thus, the ALJ was correct in noting that Dr. Wilson's assessments were not based entirely on diagnostic findings.  However, "the lack of specific clinical findings in the treating physician's report [does] not, standing by itself, justify the ALJ's failure to credit the physician's opinion."  Clark, 143 F.3d at 118 (citing Schaal, 134 F.3d 496)).  The ALJ has an "affirmative duty to develop the record and seek additional information from the treating physician, *sua sponte,* even if plaintiff is represented by counsel" to determine upon what information the treating source was basing his opinions.  Colegrove v. Comm'r of Soc. Sec., 399 F.Supp.2d 185, 196 (W.D.N.Y. 2005) (citing Clark, 143, F.3d at 118; Schaal, 134 F.3d at 505); See also 20 C.F.R. §§ 404.1212(e)(1), 416.912(e)(1) ("We will seek additional evidence or clarification from your medical source when the report from your medical source … does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques.").  Failure to re-contact is error.  See Taylor v. Astrue, No. CV-07-3469, 2008 WL 2437770, at *3 (E.D.N.Y. June 17, 2008) (finding it error for the ALJ to not re-contact Plaintiff's treating physician when he determined that the physician's opinion was "not well-supported by objective medical evidence").

---

[36] Treatment notes, submitted by Dr. Wilson, also include three scans of Plaintiff's chest, all completed before Plaintiff's alleged onset date (R. at 145-148).  Two of the scans, completed on June 18, 2003 and June 5, 2003, were requested by Dr. Magsino (R. at 146-148).  The third, completed on October 21, 2003, was requested by Dr. Wilson (R. at 145).  However, because Plaintiff does not appear to be arguing that the ALJ's finding of 'minimal weight' for this time period was incorrect, they will not be discussed.

As for Dr. Wilson's MSS, it was "given only moderate weight because his comments and his office notes … offer little to support the opinions.  Furthermore, even the minimal x-ray and MRI findings … do not support such severe restrictions" (R. at 30).  However, it appears that neither of the reasons the ALJ gave for discounting the MSS of Dr. Wilson are valid.

First, the ALJ cannot discount the opinion of a treating physician "solely on the basis that [his] opinions allegedly conflicted with the [his] own clinical findings." Balsamo v. Chater, 142 F.3d 75, 80 (2d Cir. 1998).  Here, the ALJ found that Dr. Wilson's treatment notes did not support the MSS filed by him.  It was error for the ALJ to assign the weight given to Dr. Wilson's opinion on this reasoning.

Second, the ALJ cannot substitute his lay opinion for that of a competent physician.  Balsamo, 142 F.3d at 81 (quoting McBrayer v. Sec'y of Health & Human Servs., 712 F.2d 795, 799 (2d Cir. 1983)).  It appears that the ALJ did so when he stated "the minimal x-ray and MRI findings … do not support such severe restrictions" (R. at 30).  It is unclear how the ALJ interpreted the MRI findings to determine that they did not support Dr. Wilson's MSS.[37]  Thus, the Court concludes that the ALJ substituted his own opinion in place of Dr. Wilson's opinion.

### b)  Failure to Re-Contact Dr. Kuthuru

14.    Plaintiff also argues that the ALJ erred in failing to re-contact Dr. Kuthuru, Plaintiff's treating physician for his pain condition, in order to obtain an MSS from the doctor.  See Plaintiff's Brief, p. 20.

---

[37] The MRI's the ALJ cited were requested by Dr. Kuthuru (R. at 244-246).  There also is no indication from the record that Dr. Wilson saw the reports generated from them.

The ALJ has an affirmative duty to develop the record.  Echevarria v. Sec'y of Health & Human Servs., 685 F.2d 751, 755 (2d Cir. 1982).  This duty exists regardless of whether Plaintiff is represented by counsel or is continuing *pro se*. Perez v. Chater, 77 F.3d 41, 47 (2d Cir. 1996).  If the evidence received is not adequate to determine whether an individual is disabled, additional information must be gathered by first re-contacting Plaintiff's treating physician.  20 C.F.R. §§ 404.1512(e)(1), 416.912(e)(1).

"The duty to develop the record is 'particularly important' when obtaining information from a claimant's treating physician due to the 'treating physician' provisions in the regulations."  Dickson v. Astrue, No. 1:04-CV-0511, 2008 WL 4287389, at *13 (N.D.N.Y. Sept. 17, 2008) (citing Devora v. Barnhart, 205 F.Supp.2d 164, 172 (S.D.N.Y. 2002)).  Because of this 'particularly important' duty, the ALJ has an affirmative obligation to make reasonable efforts to obtain from Plaintiff's treating physicians any necessary reports, including an assessment of Plaintiff's RFC.  Dickson, 2008 WL 4287389, at *13.  However, a treating source will not be re-contacted "when we know from past experience that the source either cannot or will not provide the necessary findings."  20 C.F.R. §§ 404.1512(e)(2), 416.912(e)(2).

According to the record, Dr. Kuthuru was contacted by the SSA on September 27, 2004, and again October 18, 2004 (R. at 154).  Although the disability worksheet states that Dr. Kuthuru "did not respond to our requests," there are treatment notes in the record from Dr. Kuthuru, indicating that at some point he did in fact submit records (R. at 200-243).  Thus, under these facts, this Court cannot find that the ALJ "kn[ew] from past experience that the source either [could ]not or [would] not provide the necessary findings."  20 C.F.R. §§ 404.1512(e)(2), 416.912(e)(2).

An MSS or RFC from Dr. Kuthuru is especially important given that the ALJ only granted Dr. Kuthuru "greater weight," Dr. Wilson's MSS was only afforded "moderate weight," and the only other individual to assess Plaintiff's RFC was a disability analyst (R. at 30, 194-199).  Therefore, the ALJ failed to adequately develop the record by failing to re-contact Dr. Kuthuru in an attempt to obtain an MSS or RFC from him.  See Hopper v. Comm'r of Soc. Sec., No. 7:06-CV-0038, 2008 WL 724228, at *11 (N.D.N.Y. Mar. 17, 2008) (remanding, in part, because the ALJ failed to re-contact Plaintiff's treating physicians after noting that the record did not contain an RFC or MSS from any of Plaintiff's treating physicians); Dickson, 2008 WL 4287389, at *9 (remanding, in part, for failure to re-contact Plaintiff's treating physician to request an RFC assessment).

Accordingly, it is recommended that this case be remanded in order to allow the ALJ to a) re-contact Dr. Wilson, to attempt to obtain an explanation for the basis of his findings; b) reassess the reasoning behind the weight granted to Dr. Wilson's MSS; and c) re-contact Dr. Kuthuru, to attempt to obtain an MSS or RFC.

**Allegation 3: The RFC Was Not Supported By Substantial Evidence**

**a)  The RFC Failed To Take Into Account Dr. Wilson's Findings**

15.     Plaintiff argues that the ALJ failed to take into account Dr. Wilson's findings when assessing Plaintiff's RFC.  See Plaintiff's Brief, p. 21.  However, because this Court has already found it error not to re-contact Dr. Wilson, this argument will not be discussed, as re-contacting will necessarily have an impact on the weight granted Dr. Wilson and his effect on the RFC.  See Allegation 2(a).

**b)  The RFC Failed to Include Limitations from Plaintiff's Depression, Despite Finding that it was Severe**

27

16.     Plaintiff's next argument is that that ALJ failed to include any limitations from

Plaintiff's depression, despite finding that it was severe.  <u>See</u> Plaintiff's Brief, p. 21.

Defendant responds by arguing that Plaintiff's mental impairments do not further limit

his RFC.  <u>See</u> Defendant's Brief, p. 14.

        This decision will also not be reached because Plaintiff's treating physician for his

mental impairments was Dr. Wilson.  Thus, the ALJ's RFC regarding Plaintiff's mental

impairments will necessarily be impacted by re-contacting Dr. Wilson for an explanation

of the basis for his findings.  <u>See</u> Allegation 2(a).

### c)  The Exertional Capacities in the Function-by-Function Analysis were Not Considered Separately

17.     Plaintiff also argues that the ALJ failed to follow SSR 96-8p and consider the

exertional capacities in the function-by-function analysis separately.  <u>See</u> Plaintiff's

Brief, p. 22.  Defendant responds by arguing that the RFC was supported by substantial

evidence.  <u>See</u> Defendant's Brief, pp. 12-14.

        According to SSR 96-8p, "[t]he RFC assessment must first identify the

individual's functional limitations or restrictions and assess his or her work-related

abilities on a function-by-function basis, including the functions in paragraphs (b),[38]

(c),[39] and (d)[40] of 20 CFR §§ 404.1545 and 416.945.  Only after that may Plaintiff's RFC

be expressed in terms of the exertional levels of work . . . ."  SSR 96-8p, 1996 WL

---

[38] "Physical abilities. . . . such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping or crouching) . . . ."  20 C.F.R. § 404.1545(b).

[39] "Mental abilities. . . . such as limitations in understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, co-workers, and work pressures in a work setting . . . ."  20 C.F.R. § 404.1545(c).

[40] Other abilities affected by impairment(s). . . . such as skin impairment(s), epilepsy, impairment(s) of vision, hearing or other senses, and impairment(s) which impose environmental restrictions . . . ."  20 C.F.R. § 404.1545(d).

374184, at *1.  There is also the requirement that "[e]ach function must be considered separately . . . [even if] the final RFC assessment will combine activities."  SSR 96-8p, 1996 WL 347184, at *5.

Here, the ALJ made the following exertional limitation findings in his function-by-function analysis: "the claimant retains the residual functional capacity to lift, carry, push and pull 20 pounds occasionally and 10 pounds frequently, stand and walk 20 minutes at a time for a total of two hours in an eight-hour work day and sit 45 minutes at a time for a total of six hours in an eight-hour work day" (R. at 31).

Plaintiff is correct in that the ALJ grouped Plaintiff's physical functions.  However, courts have declined to remand if the ALJ's only failure was to group the functions, and that failure had no impact on the outcome of the ALJ's RFC determination.  See Martin v. Astrue, No. 5:05-CV-72, 2008 WL 4186339, at *16 (N.D.N.Y. Sept. 9, 2008) (declining to remand, despite finding that the ALJ grouped the functions in his function-by-function analysis because "treating the activities separately would not have changed the result of the RFC determination").

While this Court declines to remand on this issue, because the result would have been identical even if they were separated, this issue is moot as this Court is remanding for failure to follow the treating physician rule.  Thus, despite finding no error in this instance, on remand the ALJ should consider the functions separately because "it is not invariably the case that treating the activities together will result in the same decisional outcome as treating them separately."  SSR 96-8p, 1996 WL 374184, at *6.

### d)  The ALJ Did Not Assess Plaintiff's Ability to do Work on a Regular and Continuing Basis

29

18.     Plaintiff argues that the ALJ did not assess Plaintiff's ability to do work on a regular and continuing basis.  See Plaintiff's Brief, pp. 22-23.  Defendant responds by arguing that the ALJ's RFC determination was supported by substantial evidence.  See Defendant's Brief, pp. 12-14.

An individual's ability to do work activities must be assessed "on a regular and continuing basis."  20 C.F.R. §§ 404.1545(b), (c); 416.945(b), (c).  Regular and continuing basis is defined as "8 hours a day, for five days a week, or an equivalent work schedule."  SSR 96-8p, 1996 WL 374184, at *1.

Plaintiff appears to be basing this argument on the findings of Dr. Wilson.[41]  As this Court previously found that the ALJ erred with respect to Dr. Wilson, this argument will not be discussed.  See Allegation 2(a).

### Allegation 4: The ALJ Erred at Step Five of the Sequential Evaluation

Plaintiff argues that the ALJ erred in a) finding him capable of performing the full range of sedentary work; b) not relying upon Medical-Vocational Rule 201.00(h)(3); and c) not consulting a VE.  See Plaintiff's Brief, p 23.  Defendant responds by arguing that the ALJ's use of the grids was appropriate.  See Defendant's Brief, pp. 18-20.

### a)  The ALJ Erred in Finding Plaintiff Capable of Sedentary Work

19.     Plaintiff argues that the ALJ erred in finding him capable of sedentary work.  See Plaintiff's Brief, p. 23.  However, because this Court previously found that the ALJ erred with respect to the treating physician rule, Plaintiff's RFC is necessarily flawed.  Thus,

---

[41] Dr. Wilson opined that Plaintiff would miss three days of work each month due to his impairments or treatment and had only a fair ability to maintain attendance, be punctual, and complete a normal workweek without interruptions (R. at 251-252).

Plaintiff's argument that the ALJ erred in finding him capable of sedentary work will not be discussed as it was based on his RFC.

### b) The ALJ Erred in Not Relying Upon Medical-Vocational Rule 201.00(h)(3)

20.     Plaintiff argues that the ALJ should have relied on Medical-Vocational Rule 201.00(h)(3) as a framework to find Plaintiff disabled.  See Plaintiff's Brief, p. 23. Defendant responds by arguing that the ALJ's reliance on Medical-Vocational Rules 202.20 and 201.27 was proper.  See Defendant's Brief, p. 19.

The ALJ stated that "using medical-vocational rules 202.20 and 201.27 as a framework, together with Social Security Ruling 83-10 for guidance, it is concluded that jobs the claimant can perform exist in significant numbers in the national economy" (R. at 32).  Rule 202.20 states that a younger individual from eighteen to forty-nine, with a high school education, with no skills from past work, who can perform light work, is not disabled.  20 C.F.R. Pt. 404, Subpt. P, App. 2; Rule 201.00(h)(1).  Rule 201.27 states that a younger individual from eighteen to forty-four, with a high school education, with no skills from past work, who can perform sedentary work, is not disabled.  Id.  Because the ALJ found that Plaintiff could perform a limited range of light work, and the full range of sedentary work, he applied SSR 83-12 (R. at 32).  SSR 83-12 states that "[i]f the individual's exertional capacity falls between two rules which direct the same conclusion, a finding of 'disabled' or 'not disabled,' as appropriate, will follow."  SSR 83-12, 1983 WL 31253, at *2.  Because both Rule 202.20 and Rule 201.27 directed a finding of not disabled, the ALJ then concluded that Plaintiff was not disabled (R. at 32).

Plaintiff argues that the ALJ erred in not following Medical-Vocational Rule 201.00(h)(3).  This rule states, in part, that: "a decision of 'disabled' may be appropriate for some individuals under 45 … who do not have the ability to perform a full range of sedentary work.  However, the inability to perform a full range of sedentary work does not necessarily equate with a finding of 'disabled.'"  20 C.F.R. Pt. 404, Subpt. P, App. 2.  Because Rule 201.00(h)(3) is based on the premise that an individual be found capable of performing less than the full range of sedentary work, and the ALJ in this case did not make such a finding, this Court cannot find that the ALJ erred.  However, this Court notes that on remand, if the ALJ finds upon reconsideration, that Plaintiff can perform less than the full range of sedentary work, Rule 201.00(h)(3) may be appropriate.

### c)  The ALJ Erred in Not Consulting a Vocational Expert

21.     Plaintiff's final argument is that the ALJ erred in not consulting a Vocational Expert ("VE").  See Plaintiff's Brief, p. 23.  Defendant responds by arguing that the use of a VE was not required under the circumstances.  See Defendant's Brief, pp. 19-20.

The use of the Medical-Vocational Guidelines is inappropriate "where the claimant's work capacity is significantly diminished beyond that caused by his exertional impairment . . . .  '[S]ignificantly diminish' [] mean[s] the additional loss of work capacity beyond a negligible one or, … one that so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity."  Bapp v. Bowen, 802 F.2d 601, 605-606 (2d Cir. 1986).  "If the ALJ finds that [plaintiff's] ability is significantly diminished, then the Commissioner should be required to present the testimony of a vocational expert or other evidence concerning the existence of jobs in the national

32

economy for an individual with [plaintiff's] limitations." Pratts v. Chater, 94 F.3d 34, 39 (2d Cir. 1996).

In terms of Plaintiff's non-exertional impairments, the ALJ found that Plaintiff was "able to understand, remember and carry out simple instructions; maintain concentration and attention for extended periods; and respond appropriately to supervision, coworkers and work situations" (R. at 31).

Here, the ALJ's findings as to Plaintiff's non-exertional impairments do not amount to a level that significantly diminishes his work capacity.  Thus, the ALJ was correct in not consulting a VE.  However, on remand, the ALJ should consider the use of a VE if he determines that Plaintiff is so limited in his non-exertional impairments that it significantly diminishes his work capacity.

22.    In examining the ALJ's decision, the Court also notes that the ALJ failed to complete a thorough credibility analysis as required by the Commissioner's regulations at 20 C.F.R. §§ 404.1529(c) and 416.929(c), and clarified in SSR 96-7p.  While Plaintiff did not raise the issue of the faulty credibility analysis in his brief, the Court recommends remanding this matter to the ALJ so that he can provide a credibility analysis that fully complies with the regulations.

"An administrative law judge may properly reject claims of severe, disabling pain after weighing the objective medical evidence in the record, the claimant's demeanor, and other indicia of credibility, but must set forth his or her reasons with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence." Lewis v. Apfel, 62 F.Supp.2d 648, 651 (N.D.N.Y. 1999) (internal citations

omitted).   To this end, the ALJ must follow a two-step process to evaluate Plaintiff's

contention of pain, set forth in SSR 96-7p, 1996 WL 374186, at *2:

> First, the adjudicator must consider whether there is an underlying medically determinable physical or medical impairment (s) … that could reasonably be expected to produce the individual's pain or other symptoms . . . .
> Second, . . . the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities . . . .

According to 20 C.F.R. §§ 404.1529(c)(3)(i)-(vii) and 416.929(c)(3)(i)-(vii), if

Plaintiff's pain contentions are not supported by objective medical evidence, the ALJ

must consider the following factors in order to make a determination of Plaintiff's

credibility concerning his pain:

1. [Plaintiff's] daily activities;
2. The location, duration, frequency and intensity of [Plaintiff's] pain or other symptoms;
3. Precipitating and aggravating factors;
4. The type, dosage, effectiveness, and side effects of any medication [Plaintiff] take[s] or ha[s] taken to alleviate . . . pain or other symptoms;
5. Treatment, other than medication [Plaintiff] receive[s] or ha[s] received for relief of . . . pain or other symptoms;
6. Any measure [Plaintiff] use[s] or ha[s] used to relieve . . . pain or other symptoms;
7. Other factors concerning [Plaintiff's] functional limitations and restrictions due to pain or other symptoms.

If the ALJ finds Plaintiff's pain contentions are not credible, he must state his

reasons "explicitly and with sufficient specificity to enable the Court to decide whether

there are legitimate reasons for the ALJ's disbelief."  Young v. Astrue, No. 7:05-CV-

1027, 2008 WL 4518992, at *11 (N.D.N.Y. Sept. 30, 2008) (quoting Brandon v. Bowen,

666 F.Supp 604, 608 (S.D.N.Y. 1987)).

34

The ALJ began the two-step process by finding Plaintiff had the following medically determinable impairments: "emphysema, a back impairment with pain, migraine headaches and depression" (R. at 27).  However, the ALJ did not continue on to make a determination as to whether these medically determinable impairments could reasonably cause Plaintiff's pain and other limitations that he claimed.  The ALJ then proceeded to a thorough analysis of Plaintiff's symptoms with careful consideration of the seven factors listed above, and a finding that Plaintiff was "partially credible" (R. at 27-31).  This was error.  See Hogan v. Astrue, 491 F.Supp.2d 347, 352-353 (W.D.N.Y. 2007) (remanding, in part, because the ALJ failed to find whether plaintiff's impairments "could reasonably be expected to produce the pain . . . she alleged" despite noting that the ALJ "carefully review[ed]" the seven factors set forth in 20 C.F.R. §§ 404.1529(c)(3)(i)-(vii) and 416.929(c)(3)(i)-(vii)).

Therefore, the ALJ erred in not following the appropriate legal standard.  Accordingly, it is recommended that this case be remanded to allow the ALJ an opportunity to comply with all of the requirements of SSR 96-7p and 20 C.F.R. §§ 404.1529 and 416.929.

## Conclusion

Based on the foregoing, it is recommended that Defendant's motion for judgment on the pleadings should be DENIED; Plaintiff's cross motion for judgment on the pleadings should be DENIED in part and GRANTED in part and REMANDED for reconsideration.

35

Respectfully submitted,

Victor E. Bianchini
United States Magistrate Judge


Syracuse, New York

DATED:      March 5, 2009

## ORDER

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby


**ORDERED** that this Report and Recommendation be filed with the Clerk of the Court.


**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of the Court within ten (10) days of receipt of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(e) of the Federal Rules of Civil Procedure and Local Rule 72.3.

**Failure to file objections within the specified time or to request an**

**extension of such time waives the right to appeal the District Court's Order.**

 *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985);   *Small v.*

*Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989);   *Wesolek v.*

*Canadair Limited,* 838 F.2d 55 (2d Cir.1988).

Let the Clerk send a copy of this Report and recommendation to the attorneys for

the Plaintiff and the Defendants.

SO ORDERED.


Victor E. Bianchini
United States Magistrate Judge



Syracuse, New York

DATED:        March 5, 2009